NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| SANOFI-AVENTIS DEUTSCHLAND | : | **Hon. Dennis M. Cavanaugh** |
| GMBH, AVENTIS PHARMA S.A., | : | |
| ABBOTT GMBH & CO. KG and | : | **OPINION** |
| ABBOTT LABORATORIES | : | |
| | : | Civil Action No. 07-CV-5855 (DMC) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| GLENMARK PHARMACEUTICALS | | |
| INC., USA and GLENMARK | | |
| PHARMACEUTICALS LTD, | | |
| | | |
| Defendants. | | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon application by Plaintiffs sanofi-aventis Deutschland GmbH and Aventis Pharm S.A. ("sanofi-aventis") and Abbott GmbH & Co. KG and Abbott Laboratories ("Abbott") (collectively, "Plaintiffs") for an Order to Show Cause why Defendants Glenmark Pharmaceuticals, Inc., USA and Glenmark Pharmaceuticals, Ltd. (collectively, "Defendants") should not be preliminarily enjoined and temporarily restrained from selling generic versions of Tarka®, United States Patent No. 5,721,244 (the "'244 patent"). Pursuant to Fed. R. Civ. P. 78, no oral argument was heard. After considering the submissions of all parties, and based upon the following, it is the decision of this Court that Plaintiffs application for an Order to Show Cause with temporary restraints is **denied.**

I.   BACKGROUND

A.   Patents

The '244 patent, titled "Combination of Angiotensin-Converting Enzyme Inhibitors with Calcium Antagonists as well as their Use in Drugs[,]" issued on February 24, 1998, with a filing date of June 7, 1995 and a foreign application priority date of October 2, 1986.  The '244 patent discloses and claims a "pharmaceutical composition" used to treat hypertension.  The pharmaceutical composition contains an angiotensin-converting enzyme inhibitor ("ACE inhibitor") having certain bicyclic or tricyclic ring systems and a calcium antagonist (also known as a calcium channel blocker or "CCB") in "amounts effective for treating hypertension."  Plaintiffs identify at least two claimed embodiments under the '244 patent, including (1) a composition of quinapril, an ACE inhibitor, and a calcium antagonist; and (2) a composition of trandolapril, another ACE inhibitor, with a calcium antagonist.

The patent owner, sanofi-aventis, granted Abbott an exclusive license to manufacture, use and sell pharmaceutical products covered by the '244 patent.  Abbott filed a New Drug Application ("NDA") No. 20-591 with the Food and Drug Administration ("FDA").  On October 22, 1996, the FDA approved Abbott's NDA application, allowing Abbott to sell drug products containing the active ingredients trandolapril, an ACE inhibitor, and verapamil hydrochloride, a calcium antagonist, in the United States under the trademark Tarka®.  Trandolapril is the subject of a separate patent, United States Patent No. 4,933,361 (the "'361 patent), owned by Abbott.

Thereafter, Glenmark filed an Abbreviated New Drug Application ("ANDA") No. 79-135 with the FDA for approval to market a generic version of the drug Tarka®, 4 milligram trandolapril/240 mg verapamil hydrochloride extended release tablets. On May 5, 2010, the FDA

2

granted Glenmark final approval of ANDA No. 79-135.  On May 12, 2010, Glenmark notified Plaintiffs of Defendants intention to launch the generic version of Tarka® on June 9, 2010.  On May 14, 2010, Plaintiffs filed an application with this Court for an Order to Show Cause why Defendants should not be preliminarily enjoined and temporarily restrained from marketing the generic version of Tarka® until resolution of this case.

Plaintiffs also obtained United States Patent 5,098,910 (the "'910 patent") on March 24, 1992 with a filing date of May 30, 1989 and a foreign application priority date of October 2, 1986.  The '910 patent indicates that the "present invention relates to a combination of angiotensin-converting enzyme inhibitors (ACE inhibitors) with calcium antagonists as well as their use in drugs, especially in hypotensive drugs."  The '910 patent claims a pharmaceutical composition comprising of ramipril, an ACE inhibitor, and a calcium antagonist.

B.     Prior Art[1]

At the time of the invention claimed by the '244 patent, relevant prior art consisted of ACE inhibitors including captopril, enalapril, quinapril and lisinopril. Prior art references concerning captopril include the following documents: Michele Stornello, M.D., *Hemodynamic and Humoral Interactions Between Captopril and Nifedipine*, Hypertension, An Official Journal of the American Heart Association, September-October 1993, at III (the "Stornello reference"); Rene M. L. Brouwer, *Antihypertensive Treatment Using Calcium Antagonists in Combination with Captopril rather than Diuretics*, Journal of Cardiovascular Pharmacology, 1985, at S88 (the "Brouwer reference"); G.A.

---

[1] The prior art references outlined by the Court are documented for purposes of this application and, therefore, listed references are not to be construed to the exclusion of any other not listed.

MacGregor, *Captopril*: *Contrasting Effects of Adding Hydrochlorothiazide, Propranolol, or Nifedipine*, Journal of Cardiovascular Pharmacology, 1985, at S82 (the "MacGregor reference"); Albert Mimran, *Effect of Chronic Nifedipine in Patients Inadequately Controlled by a Converting Enzyme Inhibitor and a Diuretic*, Journal of Cardiovascular Pharmacology, 1985, at S92 (the "Mimran reference"); and William B. White, M.D., *Effects of Combination Therapy with Captopril and Nifedipine in Severe or Resistant Hypertension*, Clinical Pharmacology Therapeutics, January 1986, at 43 (the "White reference"). Prior art references concerning enalapril include the following documents: M.E. Vincent, *Hemodynamic and Humoral Responses to Enalapril and Nifedipine in the Rat*, Clin. And Expert. - Theory and Practice, A6(8), 1984, at 1485 (the "Vincent reference"); and United States Patent No. 4,703,038 (the "Garthoff reference"). Prior art references concerning quinapril include the following documents: H.R. Kaplan, *CI-906 and CI 907: new orally active nonsulfhydryl angiotensin-converting enzyme inhibitors*, Federation Proceedings, April 1984, at 1326 (the "Kaplan reference"); M.J. Ryan, *Antihypertensive profile of the angiotensin-converting enzyme inhibitors CI-906 and CI-907*, Federation Proceedings, April 1984, at 1330 (the "Ryan reference"); and I. Gavras, *Pilot Study of the effects of the Angiotensin-Converting Enzyme Inhibitor CI-906 on Patients with Essential Hypertension*, The Journal of Clinical Pharmacology, August-September 1984, at 343 (the "Gavras reference"). Prior art concerning lisinopril includes the aforementioned Garthoff reference.

### 1.    Stornello reference

In summary, the Stornello reference documents the study of nine patients with uncomplicated essential hypertension who were administered captopril (25 mg three times daily), nifedipine (10 mg three times daily), and both drugs for one week. The reference asserts the following conclusions:

4

(1) captopril and nifedipine exert an additive effect on blood pressure and renin; (2) captopril counteracts the heart rate increase induced by nifedipine; and (3) nifedipine does not influence the aldosterone inhibition induced by captopril. Further, "[i]t is suggested that the association of the two drugs can be usefully employed in the treatment of hypertension." Otherwise stated, "besides any theoretical consideration, the findings that captopril and nifedipine exert an additive hypotensive effect, indicate that these two drugs can be usefully combined in the treatment of hypertensive patients."

2.      Brouwer reference

In summary, the Brouwer reference documents "[t]he antihypertensive efficacy of combination therapy with the angiotensin-converting enzyme inhibitor captopril and a diuretic or a calcium antagonist" in sixteen patients with hypertension with a blood pressure over 160/95 mm Hg having triple drug therapy. The reference indicates that "[c]aptopril's antihypertensive efficacy can be equally enhanced by calcium antagonists [ ] as by diuretics" Further, the reference suggests that the "calcium antagonist-captopril combination may be of particular advantage in hypertensive patients who are otherwise difficult to treat."

3.      MacGregor reference

In summary, the MacGregor reference documents the study of "the effect of sodium intake and of captopril combined with hydrochlorothiazide, propranolol, and nifedipine." The reference indicates that "[n]ifedipine added to captopril reduced blood pressure more than either drug alone[,]" and further, "[b]oth diuretics and nifedipine increase the effectiveness of captopril[.]"

5

4.      Mimran reference

In summary, the Mimran reference documents the administration of nifedipine, in a slow release preparation, to twelve patients with severe hypertension in whom arterial pressure had not been satisfactorily controlled by the combination of a converting enzyme inhibitor and a diuretic. During the course of the experiment, the administration of a diuretic was discontinued.  The reference indicates that "the administration of nifedipine was effective in treating patients in whom hypertension had not been controlled adequately by the combination of a converting enzyme inhibitor (captopril or enalapril) and a diuretic (furosemide or hydrochlorothiazide)."  The reference concludes that "calcium blockers may be an effective alternative to diuretics in patients receiving a converting enzyme inhibitor."

5.      White reference

In summary, the White reference documents the study of patients with severe or resistant hypertension who underwent therapy with captopril and nifedipine alone and in combination.  The resulting data demonstrates "that combination therapy with captopril and nifedipine is effective in patients with severe hypertension, but frequent dosing intervals are necessary for adequate antihypertensive control."

6.      Vincent reference

In summary, the Vincent reference documents the "hemodynamic and humoral effects of enalapril, an angiotensin converting enzyme (ACE) inhibitor, and nifedipine, a calcium-entry blocker, [as] evaluated in conscious spontaneously hypertensive rats (SHR)."  The reference indicates that these "data suggest that coadministration of an ACE inhibitor and calcium-entry

6

blocker may provide better blood pressure control than either drug class alone and at the same time prevent the reflex tachycardia frequently observed after nifedipine." Further, the reference indicates that the "results of this study confirm antihypertensive effects of enalapril and nifedipine in the spontaneously hypertensive rat."

   7. Garthoff reference

   The Garthoff reference, titled "Combination of Dihydropyridines with Angiotensin Converting Enzymes-Inhibitors," concerns a combination of dihydropridine derivatives with compounds which  inhibit the formation of enzymes which control the conversion of angiotensin I into angiotensin II and their use as antihypertensive agents." Garthoff discloses a combination of enalapril or lisinopril with a calcium antagonist, such as nitrendipine nisoldipine, nicardipine or felodipine.  The patent further indicates, "[c]ompounds which inhibit the formation of enzymes which convert angiotensin I into angiotensin II are called ACE inhibitors (angiotensin converting enzymes).  These compounds are known as antihypertensive agents, since they reduce blood pressure if the hypertension can be attributed to angiotensin II."

   8. Kaplan reference

   In summary, the Kaplan reference documents the pharmacologic properties of two new nonsulfhydryl-type ACE inhibitors, CI-906 and CI-907, and compares key aspects of their profiles with other ACE inhibitors. The reference indicates that "the preclinical profile shows CI-906 and CI-907 to be specific, potent, orally active ACE inhibitors.  They are expected to have therapeutic utility in hypertension and in any other condition where converting enzyme inhibition would be useful."

9.      Ryan reference

In summary, the Ryan reference documents the "antihypertensive activity of CI-906 and CI-907 in rat and dog models of experimental hypertension." "Their antihypertensive profiles were compared with the reference agents captopril and enalapril." "These studies indicate that CI-906 and CI-907 are potent, orally active antihypertensive agents without any apparent limiting side effects." Further, the study indicates that these new ACE inhibitors have a long duration of action.

10.      Gavras reference

In summary, the Gavras reference documents the "effects of two single doses of the new oral nonsulfhydryl angiotensin-converting enzyme (ACE) inhibitor CI-906 on blood pressure and hormone levels" in eight patients with essential hypertension.  The study indicates that the "therapeutic value of captopril, the first orally active angiotensin-converting enzyme (ACE) inhibitor to become commercially available, is now well established.  A large number of clinical studies have demonstrated its antihypertensive effectiveness in all types of hypertension."  The study also indicates that enalapril, a nonsulfhydryl ACE inhibitor, has been found to be at least as effective as captopril in hypertension.  Additionally, the study confirms that the "ACE inhibitor CI-906 is indeed an effective antihypertensive agent."

## II.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 65, a court is permitted to grant preliminary injunctions and temporary restraining orders. See Fed. R. Civ. P. 65.  "Temporary restraining orders are a form of injunction and proceedings concerning them are governed by Rule 65." Vuitton v. White, 945 F.2d 569, 573 (3d Cir. 1991) (citing Sims v. Greene, 160 F.2d 512 (3d Cir. 1947))..

"When a district court issues a temporary restraining order, that order expires within ten days." Id. "Moreover, whether the court grants or denies the order, the plaintiff can apply for a preliminary injunction." Id. Rule 65(d) requires specificity, indicating "every order granting an injunction and every restraining order shall set forth the reasons why it issued; state its terms specifically; and describe in reasonable detail – and not by referring to the complaint or other document- - the act or acts restrained or required." Pursuant to Rule 52(d), "in granting or refusing interlocutory injunctions, the court shall set forth the findings of fact and conclusions of law which constitute the grounds of the action." Educational Testing Services v. Katzman, 793 F.2d 533, 537 (3d Cir. 1986). "A preliminary injunction is a 'drastic remedy' that is not to be routinely granted." Novartis Pharms. Corp. v. Teva Pharms. Corp., 2007 U.S. Dist. LEXIS 65792, *14 (D.N.J. Sep. 6, 2007) (citing Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993)).

"A decision to grant or deny a preliminary injunction is within the sound discretion of the district court." Oakley, Inc. v, Sunglass Hut Int'l, 316 F.3d 1331,1339 (Fed. Cir. 2003). "In determining whether a preliminary injunction should issue, we apply the four factor test set forth by the Supreme Court. In general, "[a] plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" Am. Signature Inc. v. United States, 598 F.3d 816, 823 (Fed. Cir. 2010) (quoting Winter v. NRDC, Inc., 129 S. Ct. 365, 374 (2008)). The same standard applies with respect temporary restraints. See Opticians Ass'n of Am. v. Ind. Opticians of Am., 920 F.2d 187, 191-92 (3d Cir. 1990); Esquire Deposition Servs., LLC v. Boutot, 2009 U.S. Dist. LEXIS 52207, *17 (D.N.J. June 22, 2009).

"[T]he patentee seeking a preliminary injunction in a patent infringement suit must show that it will likely prove infringement, and that it will likely withstand challenges, if any, to the validity of the patent." Titan Tire Corp. v. Case New Holland Inc., 566 F.3d 1372, 1376 (Fed. Cir. 2009). "In assessing whether the patentee is entitled to the injunction, the court views the matter in light of the burdens and presumptions that will inhere at trial." Id.; see Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429 (2006) ("[T]he burdens at the preliminary injunction stage track the burdens at trial."). "*Before trial*, when the question of validity arises at the preliminary injunction stage, the application of these burdens and presumptions is tailored to fit the preliminary injunction context. To begin, the patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation." Id. (citing Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1085, 1088 (Fed. Cir. 1998). "Thus, if a patentee moves for a preliminary injunction and the alleged infringer does not challenge validity, the very existence of the patent with its concomitant presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue." Id.; see Purdue Pharma L.P. v. Boehringer Ingleheim GmbH, 237 F.3d 1359, 1365 (Fed. Cir. 2001) (In the preliminary injunction context, Defendant bears the initial burden of producing evidence that raises a "'substantial question' concerning validity, [or] enforceability."). "If, instead, the alleged infringer responds to the preliminary injunction motion by launching an attack on the validity of the patent, the burden is on the challenger to come forward with evidence of invalidity, just as it would be at trial." Id. "The patentee, to avoid a conclusion that it is unable to show a likelihood of success, then has the burden of responding with contrary evidence, which of course may include analysis and argument." Titan, 566 F.3d at 1376. "Instead of the alleged infringer having to persuade the trial court that the patent is invalid, at this stage it is the patentee, the

10

movant, who must persuade the court that, despite the challenge presented to validity, the patentee

nevertheless is likely to succeed at trial on the validity issue." Id.

III.   **DISCUSSION**

    **A.   Likelihood of Success on the Merits**

        1.   Non-Statutory Double-Patenting Obviousness

Defendants assert that the obviousness-type double patenting arising from Plaintiffs' '244

patent and '910 patent renders the '244 patent invalid.  Essentially, Defendants allege that the only

difference between claims 1, 2, and 3 of the '244 patent and claim 4 of the '910 patent is the identity

of the ACE inhibitor.  Therefore, Defendants contend that it would have been obvious to substitute

quinapril for ramipril, rendering claims 1, 2 and 3 of the '244 patent obvious. Similarly, Defendants

contend that the only distinction between claims 4 and 7 of the '244 patent and claims 9 and 10 of the

'910 patent is the ACE inhibitor making the substitution of quinapril for ramipril obvious.

In distinguishing the patents, Plaintiffs contend, assuming arguendo that the '910 patent may

be used as a reference, claims 4, 9 and 10 of the '910 patent, recite, *inter alia* a, "pharmaceutical

composition, comprising synergistically effective amounts of ramipril and a calcium antagonist," not

quinapril.  Further, Plaintiffs assert that the "claims of the '910 patent by themselves offer no teaching

-no data, studies, guidance or explanation - that would suggest to one of ordinary skill in the art that

a ramipril and a calcium antagonist composition would be effective to treat hypertension."  Moreover,

Plaintiffs underscore the structural differences between ramipril and quinapril.  Specifically, Plaintiffs

contend that quinapril has a 6/6 bicyclic partially saturated ring system while ramipril has a 5/5

bicyclic fully saturated ring system.

"In general, the obviousness analysis applies to double patenting, except for three distinctions. First, statutory obviousness compares claimed subject matter to the prior art, while non-statutory double patenting compares claims in an earlier patent to claims in a later patent or application." P&G v. Teva Pharms. USA, Inc., 566 F.3d 989, 998 (2009). "Second, double patenting does not require inquiry into a motivation to modify the prior art. Finally, double patenting does not require inquiry into objective criteria suggesting non-obviousness." Id. (internal citations omitted).

"Obviousness-type double patenting is a judicially created doctrine that prevents a patentee from extending the term of a patent by patenting an obvious variation on the original invention." Smith & Nephew, Inc. v. Arthrex, Inc., 2009 U.S. App. LEXIS 26268, *9 (Fed. Cir. Dec. 2, 2009) (citing Georgia-Pacific Corp. U.S. Gypsum Co., 195 F.3d 1322, 1326 (Fed. Cir. 1999)). "Under that doctrine, a later patent claim is not patentable over an earlier patent claim if the later claim is anticipated by, or obvious in light of, the earlier claim." Id. (citing Eli Lilly & Co. v. Barr Labs, Inc., 251 F.3d 955, 968 (Fed. Cir. 2001)). With respect to obviousness-type double patenting, the Federal Circuit has held that "the copying of claims would be material to the issue of double-patenting because a reasonable examiner would want to consider both applications. Although it is unlikely that the examiner would ultimately apply the double patenting rejection to the application with an earlier priority date, the double patenting issue would typically lead to an immediate provisional rejection as to each application.  Once all other rejections are resolved, the provisional rejection can be withdrawn to one application, which will then issue as a patent. While the rejection may be withdrawn as to the application with the earlier filing date, it is not required by the MPEP[, Manual of Patent Examining Procedure], Guidelines." Leviton Mfg. Co. v. Universal Sec. Instruments, Inc., 2010 U.S. App. LEXIS 10917, *16-17 (Fed. Cir. May 28. 2010).

The recognized distinction between the patents is the use of quinapril in the '244 patent as the ACE inhibitor and the use of ramipril in the '910 patent as the ACE inhibitor. Restricted to a claim by claim analysis for purposes of a non-statutory double-patenting analysis, the structural differences between quinapril and ramipril favor Plaintiffs with respect to the non-statutory double-patenting inquiry.

2.    Statutory Obviousness

To prevail on a defense of invalidity for obviousnes, Defendant must demonstrate by clear and convincing evidence that:

> the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a).

"The obviousness determination turns on underlying factual inquiries involving: (1) the scope and content of prior art, (2) differences between claims and prior art, (3) the level of ordinary skill in pertinent art, and (4) secondary considerations such as commercial success and satisfaction of a long-felt need." Proctor & Gamble Co. v. Teva Pharms., 566 F.3d 989, 994 (Fed. Cir. 2009) (citing Graham v. John Deere Co. of Kan. City, 383 U.S. 1, 17 (1966)). In discussing the question of obviousness, the Supreme Court indicated that the Graham case "set forth a broad inquiry and invited courts, where appropriate, to look at any secondary considerations that would prove instructive." Id. (citing Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17-18 (1966)).

In KSR International Co. v. Teleflex Inc., the Supreme Court cautioned against (1) a rigid

13

application of the teaching, suggestion and motivation ("TSM") test, and (2) a rigid application of using an "obvious to try" analysis when there is pressure to solve a problem with "a finite number of identified, predictable solutions." 127 S. Ct. 1727, 741-42 (2007).  Instead, the Court advocated a "common sense" approach to determining obviousness.  See id. at 1741-43.  Specifically, the Court explained that "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining elements in the manner claimed."  Id. at 1742.

In Takeda Chemical Industries, Ltd v. AlphapharmPty., Ltd., however, the Federal Circuit discussed the effect of KSR on the TSM test in chemical compound cases.  See 492 F.3d 1350 (Fed. Cir. 2007).  First, Takeda Chemical reaffirmed the test for *prima facie* obviousness of structurally similar compounds:

> structural similarity between claimed and prior art subject matter, proved by combining references or otherwise, where the prior art gives reason or motivation to make the claimed compositions, creates a prima facie case for obviousness.  In addition to structural similarity between the compounds, a prima facie case of obviousness also requires a showing of 'adequate support in the prior art' for a change in structure.

Id.  at 1356 (citing In re Dillon, 919 F.2d 688, 692 (Fed. Cir. 1990)); In re Grabniak, 769 F.2d 729, 731-32 (Fed. Cir. 1985); In re Deuel, 51 F.3d 1552, 1558 (Fed. Cir. 1995)).  Next, the Federal Circuit noted that the "KSR Court rejected a rigid application of the teaching, suggestion, or motivation ("TSM") test in an obviousness inquiry" but found that "[a]s long as the test is not applied as a 'rigid and mandatory' formula, that test can provide 'helpful insight' to an obviousness inquiry."  Id. at 1357(citing KSR, 127 S.Ct. at 1731).  Finally, the Federal Circuit concluded that "in cases involving new chemical compounds, . . . it remains necessary to identify some reason that would have led a

chemist to modify a known compound in a particular manner to establish prima facie obviousness of a new claimed compound." Id.  In Takeda Chemical, the Federal Circuit found that where there were many potential lead compounds, the selection of one particular compound was not an obvious choice. See 492 F.3d 1350. In Takeda Chemical, the court stated that it should look at the "prior art as a whole" to determine whether a person of ordinary skill in the art would select a compound as a lead. See id. at 1363.

i.      Scope and Content of Prior Art

Defendants contend that the '244 patent is invalid as obvious in light of prior art.  Specifically, Defendants assert that ACE inhibitors, calcium antagonists and their respective pharmacological properties were already known.  Moreover, Defendants argue that the prior art taught combining ACE inhibitors with calcium antagonists.  Plaintiffs acknowledge that captopril, enalapril and lisinopril, or other compound with a monocyclic ring system, had some ACE inhibiting activity or effect in lowering blood pressure in combination with a calcium antagonist.  However, Plaintiffs contend that, given the inherent unpredictability of chemical arts and the lack of knowledge concerning the structure of the ACE and mechanism of action in the ACE inhibitor, a person of ordinary skill in the art would not have substituted quinapril for one of the foregoing ACE inhibitors.  In fact, Plaintiffs assert that the three dimensional structure of human ACE was not arrived at until 2003, and further, the mechanism of action for ACE inhibitors is still unknown today.

a.      Captopril

Citing the Stornello, Brouwer, MacGregor, Mimran and White references, Defendants argue that each reference demonstrates that "antihypertensive therapy with the ACE inhibitor captopril and

15

a calcium antagonist was successful."  Therefore, Defendants contend that the prior art combination of captopril and calcium antagonists teaches toward and suggests the use of other ACE inhibitors in similar combinations.

By contrast, Plaintiffs argue that Defendants' construction of the captopril references is misleading given that none of the references cited by Defendants disclose captopril and CCB in a pharmaceutical composition , i.e. combined in "one formulation," such as "in one tablet or capsule." Instead, Plaintiffs assert that the references submitted by Defendants disclose the administration of captopril in a dosage separate and apart from the dosage administering a calcium antagonist. Additionally, Plaintiffs claim that the underlying studies cited by Defendants concern narrow populations, flawed and varied methodologies and no statistical validation.  Moreover, Plaintiffs allege that captopril experienced limited clinical utility as a consequence of a short half-life, requiring dosages to be administered two or three times a day in order to treat hypertension.

The Stornello reference indicates that "besides any theoretical consideration, the findings that captopril and nifedipine exert an additive hypotensive effect, indicate that these two drugs can be usefully combined in the treatment of hypertensive patients." The Brouwer reference documents antihypertensive treatment using calcium antagonists in combination with captopril rather than diuretics, and the article concludes that "in patients with hypertension that is severe or difficult to treat calcium antagonists in combination with captopril may be particularly effective and well tolerated." The MacGregor reference discusses the increased efficacy of captopril when coadministered with nifedipine.  The Mimran reference indicates that "the administration of nifedipine was effective in treating patients in whom hypertension had not been controlled adequately by the combination of a converting enzyme inhibitor (captopril or enalapril) and a diuretic (furosemide or

16

hydrochlorothiazide)," concluding that "calcium blockers may be an effective alternative to diuretics in patients receiving a converting enzyme inhibitor." Data from the White reference suggests that "combination therapy with captopril and nifedipine effectively lowers BP [(blood pressure)] in patients with severe or resistant hypertension. . . Perhaps the major disadvantage is the relatively short antihypertensive activity, requiring dosing on at least an 8-hour schedule."

b.      Enalapril/Lisinopril

Citing the Vincent reference, Defendants further assert that the prior art taught the combination of enalapril with a calcium antagonist nifedipine to lower blood pressure. Defendants also cite the Garthoff reference, describing the combination of enalapril and lisinopril with calcium antagonists, in support of the contention that the prior art suggested that "ACE inhibitors in general could be combined with calcium antagonists in general and the combinations used in antihypertensive therapy."

In response, Plaintiffs contend that although the Vincent reference tested blood pressure lowering effects in enalapril and nifedipine in spontaneously hypertensive rats, that reference neither disclosed nor suggested that the compounds were administered in a single pharmaceutical composition. In fact, Plaintiffs assert that nifedipine was administered in a separate formulation one hour after the administration of enalapril. Plaintiffs conclude that the Vincent reference demonstrated an acute effect of lowering blood pressure through the simultaneous, but independent administration of enalapril and nifedipine. Plaintiffs emphasize the fact that the Garthoff patent was considered by the patent examiner during the prosecution of the '244 patent. Further, Plaintiffs assert that although Garthoff discloses a combination of enalapril or lisinopril with a calcium antagonist, Garthoff

17

provides pharmacological data for enalapril and nitrendipine exclusively. Pharmacological data concerning any lisinopril combination is entirely absent. Indeed, Plaintiffs assert that while Garthoff demonstrates the acute and short-term effect of lowering blood pressure in rats in response to the combination of enalapril and nitrendipine, the combination fails to demonstrate efficacy in treating hypertension.

The Vincent reference identifies the purpose of the study as a comparison of the "magnitude and time course alterations in blood pressure and heart rate." The Vincent reference indicates that the "results of this study confirm the acute hypertensive effects of enalapril and nifedipine in the spontaneously hypertensive rat." However, the administration of the compounds used in this study, enalapril and nifedipine, appear to consist of two separate and independent dosages, rather than a single pharmaceutical composition.

c.    Quinapril

By 1986, citing Kaplan, Ryan and I Gavras, Defendants assert that the potency of the ACE inhibitor quinapril was known. Specifically, Defendants assert that the Kaplan reference demonstrates that quinapril was "considerably more potent" in terms of ACE inhibition than both captopril and enalapril, with a longer duration of action than captopril, and relevant references suggest therapeutic utility in hypertension. Further, Defendants contend that the Ryan reference demonstrates that quinapril is a "potent, orally active antihypertensive agent [ ] without any limiting side effects." Lastly, quoting the Gavras reference, Defendants recite, "our data indicate that the . . . ACE inhibitor CI-906 is indeed an effective antihypertensive agent . . The drug's potency and duration of action are similar to those enalapril . . . Both of these agents are more potent and longer acting than captopril."

18

In response, Plaintiffs contend that none of the foregoing references disclose or suggest using quinapril in combination with a calcium antagonist. Instead, each reference documents the use of quinapril alone. Further, Plaintiffs assert that each of the foregoing studies was acute and did not demonstrate quinapril's ability to treat hypertension. Additionally, Plaintiffs argue that the studies indicate that quinapril is equipotent to captopril, rather than more potent.

The Kaplan reference documents "CI-906 and CI-907 [as] new, potent, orally active nonsulfhydryl angiotensin-converting enzyme inhibitors having a rapid onset and prolonged duration of action." Further, "[t]hey are active as antihypertensive agents . . ." Similarly, the Ryan reference concludes, "CI-906 and CI-907 are new potent orally active hypertensive agents. Their antihypertensive profile in several models of experimental hypertension suggests that they will have therapeutic utility in both renin-dependent and renin-independent forms of hypertension."

Lastly, the Gavras reference recounts that "[a] large number of clinical studies have demonstrated [captopril's] antihypertensive effectiveness in all types of hypertension." Further, the Gavras reference identifies enalapril as at least as effective as captopril in treating hypertension, minus the adverse side effects. In the first clinical trial concerning the effects of the CI-906 agent in hypertensive patients, the Gavras reference concludes that the "nonsulfhydryl ACE inhibitor is indeed an effective antihypertensive agent." Moreover, the "drug's potency and duration of action are similar to those of enalapril, which is also a nonsulfhydryl inhibitor." Additionally, the study determines that "[b]oth agents are more potent and longer acting than captopril, although, in terms of clinical efficacy, no significant difference appears to exist between captopril and enalapril."

d.    '910 Patent[2]

For purposes of the instant application, the Court assumes, without concluding, that the '910 patent constitutes a prior art reference.  Defendants present the argument that the '910 patent, claiming a pharmaceutical composition comprising of an ACE inhibitor and a calcium antagonist, renders the '244 patent obvious by motivating or teaching a person of ordinary skill in the art to substitute quinapril for ramipril.  Plaintiffs contend, assuming arguendo that the '910 patent may be used as a reference, claims 4, 9 and 10 of the '910 patent, recite, *inter alia* a, "pharmaceutical composition, comprising synergistically effective amounts of ramipril and a calcium antagonist," not quinapril.  Further, Plaintiffs assert that the "claims of the '910 patent by themselves offer no teaching -no data, studies, guidance or explanation - that would suggest to one of ordinary skill in the art that a ramipril and a calcium antagonist composition would be effective to treat hypertension."

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art. Although common sense directs one to look with care at a patent application that claims as innovation the combination of two known devices according to their established functions, it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."   <u>KSR</u>, 500 U.S. at 418-19.   "The combination of familiar elements according to known methods is likely to be obvious when it does

---

[2]

The '244 patent and the '910 patent have identical foreign priority dates, however, the filing date of the '910 patent is March 24, 1992 while the filing date of the '244 patent is June 7, 1995.

no more than yield predictable results." In re Gleizer, 2009 U.S. App. LEXIS 27379, *7 (Fed. Cir. Dec. 15, 2009) (citing KSR, 500 U.S. at 416). "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance[,] the fact that a combination was obvious to try might show that it was obvious under § 103." Id. "[W]hen determining the patentability of a claimed invention which combines two known elements, 'the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination.'" In re Rouffet, 140 F.3d 1350, 1356 (Fed. Cir. 1998); Grain Processing Corp. v. American Maize-Products Co., 840 F.2d 902, 907 (Fed. Cir. 1988).

The '244 patent claims a pharmaceutical composition comprised of an ACE inhibitor and a calcium antagonist in amounts effective for treating hypertension.  To reiterate, Plaintiffs identify at least two claimed embodiments under the '244 patent, including (1) a composition of quinapril, an ACE inhibitor, and a calcium antagonist; and (2) a composition of trandolapril, another ACE inhibitor, with a calcium antagonist.  Importantly, the calcium antagonist does not appear to be restricted for purposes of the '244 patent and potentially, may be selected from a broad range of calcium antagonists.

As demonstrated by the Kaplan and Gavras references, quinapril was an existing ACE inhibitor in the prior art and further, quinapril was known to be an effective antihypertensive agent. Moreover, the coadministration of an ACE inhibitor and calcium antagonist is well documented, e.g. the Stornello, Brouwer and Mimran references.  Further, the Stornello, Vincent and MacGregor

references document the additive effect of coadministering an ACE inhibitor and a calcium antagonist. Moreover, to the extent that the '910 constitutes a prior art reference, the combination of an ACE inhibitor and calcium antagonist into a single pharmaceutical composition existed at the time of the invention. Therefore, this factor favors Defendants.

ii.    Differences Between the Claimed Invention and the Prior Art

Defendants assert that the only difference between the claimed invention and the prior art is the substitution of preexisting ACE inhibitors, e.g. enalapril or captopril, with quinapril. By contrast, Plaintiffs underscore significant structural differences between quinapril, captopril, enalapril and lisinopril. Specifically, Plaintiffs emphasize the contrast between monocyclic structures in captopril, enalapril and lisinopril and the bicyclic structure in quinapril, resulting in distinct physical and biological properties. Additionally, Plaintiffs claim that the structure of the ACE and the mechanism of action were unknown at the time of the invention. Further, Plaintiffs appear to suggest that an integral difference between the prior art and claimed "pharmaceutical composition" is the administration of quinapril and a calcium antagonist in a single pharmaceutical composition. In contrast, Plaintiffs characterize the former recommended method of administration as the coadminstration of separate doses of antihypertensive agents.

Given that the '244 patent does not claim the invention of quinapril, the purported structural differences between quinapril and its ACE predecessors does not favor Plaintiffs' claim of nonobviousness. Given that the '244 does not purport to resolve the problems of the structure of the ACE or mechanism of action, those arguments fail to demonstrate a viable difference between the patented invention and the prior art. Given that the '910 patent concerns an oral combination of an ACE inhibitor (ramipril) and a calcium antagonist, recognition of the '910 patent as a prior art

reference, although not determinative, favors Defendants' position.   Therefore, for purposes of this application, this factor favors Defendants.

### iii.   Level of Ordinary Skill in the Art

Defendants contend that a person of ordinary skill in the art includes an experienced pharmacologist or medical professional, possessing a Ph.D. or M.D., involved in the research and development of therapies for hypertension, not a Ph.D. chemist.  In support of this contention, and particularly, the exclusion of a Ph.D. chemist from the definition, Defendants assert that the '244 patent neither disclosed new drugs nor directed the synthesis of new drugs.

 Alternatively, Plaintiffs contend that the art concerning the '244 patent is multi-disciplined, involving medicinal chemistry, organic chemistry, pharmacology and cardiovascular medicine. Accordingly, Plaintiffs assert that a person of ordinary skill in the art would have included a person skilled in those different aspects.

Six factors have been identified as relevant to the level of ordinary skill, including (1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions; (4) rapidity of innovation; (5) sophistication f technology; and (6) educational level of active workers in the field.  Ruiz v. A.B. Chance Co., 234 F.3d 654, 666-67 (Fed. Cir. 2000) (internal citations omitted); Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc., 796 F.2d 443, 449-50 (Fed. Cir. 1986) ("Although the educational level of the inventor may be a factor in determining the level of ordinary skill in the art, it is by no means conclusive.").  "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art."  Daiichi Sankyo Co., Ltd. v. Apotex, Inc., 501 F.3d 1254, 1256 (Fed. Cir. 2007).

The parties appear to focus on the requisite education of a person in the industry at the time

of the invention.  The '244 patent concerns the pharmaceutical composition of an ACE inhibitor, including the claimed embodiments of quinapril or trandolapril with a calcium antagonist.  Therefore, it seems that a person of ordinary skill in the art would be a person who is multidisciplined in both chemistry and pharmacology. For purposes of this application, this factor is neutral.

iv.     Objective Indicia

"Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record." Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1539 (Fed. Cir. 1983); See Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17-18 (1966). Secondary considerations include copying, long-felt, but unresolved need, failure of others, unexpected results and/or properties of the claimed invention, commercial success, licenses demonstrating industry respect for the invention and skepticism of artisans before the invention. In re Rouffet, 149 F.3d at 1359.  At the same time, "objective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support." Asyst Techs., Inc. v. Emtrak, Inc., 544 F.3d 1310, 1315 (Fed. Cir. 2008).

a.     Unexpected Results/Properties

A patent applicant "relying on comparative tests to rebut a prima facie case of obviousness must compare his claimed invention to the closest prior art."  In re Johnson, 747 F.2d 1456, 1461 (Fed. Cir. 1984) (quoting In re DeBlauwe, 736 F.2d 699, 705 (Fed. Cir. 1984)). "An unexpected result must arise from combining prior art elements."  Media Techs. Licensing, LLC v. Upper Deck Co., 596 F.3d 1334, 1339 (Fed. Cir. 2010) Ortho-McNeil Pharm, Inc. v. Teva Pharms. Indus., 2009 U.S. App. LEXIS 19325, *14 (Fed. Cir. Aug. 26, 2009) (citing In re Woodruff, 919 F.2d 1575, 1578 (Fed. Cir. 1990) (a party can rebut a prima facie case if it can show that "the claimed range achieves

24

unexpected results *relative to the prior art range.*")). "In general, an applicant may overcome a *prima facie* case of obviousness by establishing 'that the [claimed] range is critical, generally by showing that the claimed range achieves unexpected results relative to the prior art range.'" In re Peterson, 315 F.3d 1325, 1330 (Fed. Cir. 2003) (citing In re Geisler, 116 F.3d 1465, 1469 (Fed. Cir. 1997)). "That same standard applies when, as here, the applicant seeks to optimize certain variables by selecting narrow ranges from broader ranges disclosed in the prior art." Id. "Moreover, the applicant's showing of unexpected results must be commensurate in scope with the claimed range." Id. In re Wertheim, 541 F.2d 257, 267 (1976), recognizes that "ranges which overlap or lie inside ranges disclosed by the prior art may be patentable if the applicant can show criticality in the claimed range by evidence of unexpected results." Id. "[W]hen the difference between the claimed invention and the prior art is the range or value of a particular variable, then a prima facie rejection is properly established when the difference in range or value is minor." Haynes Int'l v. Jessop Steel Co., 8 F.3d 1573, 1577 n.3 (Fed. Cir. 1993).

Plaintiffs claim that Tarka® is unexpectedly superior to the closest prior art combination, namely enalapril and a calcium antagonist. That is, Plaintiffs contend that Tarka® performs with longer duration of action, rendering the pharmaceutical composition more efficacious than the prior art. Further, Plaintiffs contend that a single dose of Tarka® is essentially equivalent to the effect rendered by two doses of the closest prior art combination. Plaintiffs indicate that Tarka® has demonstrated a dramatic ability to reduce blood pressure as compared to its individual components, touting Tarka® as "superadditive," i.e. more than the sum of its parts. Moreover, Plaintiffs assert that "Tarka® has also been shown to have a sustained and marked antihypertensive effect in black patients." Other unexpected properties identified by Plaintiffs include "synergistically improving

25

blood vessel structure and function, reducing the incidence of cardiac events, reducing proteinuria to a greater extent than trandolapril and verapamil monotherapy, and delaying the onset of diabetes and exhibit[ing] glycemic neutrality."

By contrast, Defendants contend that the results arrived at as a consequence of the combination of quinapril and a calcium antagonist were expected. Citing Vincent, MacGregor and Stornello, Defendants argue that the additive effect claimed by Plaintiffs has previously been successfully demonstrated by the combination of enalapril and nifedipine, a calcium antagonist, and by the combination of captopril and nifedipine. Accordingly, Defendants argue that Plaintiffs cannot assert an "additive" effect as an unexpected result. Moreover, Defendants argue that despite Plaintiffs' acknowledgment that the closest prior art combination to Tarka® is enalapril and a calcium antagonist, Plaintiffs fail to submit studies comparing Tarka® with the closest prior art. Finally, Defendants assert that while unexpected properties recited by Plaintiffs concern Tarka®, consisting of trandolapril and verapamil, the claims of the '244 are much more expansive, consisting of trandolapril or quinapril and any calcium antagonist. Although the '244 patent is broader than the claimed embodiment of Tarka®, arising unexpected results or properties will not necessarily be uniform among each and every possible combination promulgated by the '244 patent.

Therefore, to the extent Plaintiffs rely on comparative studies for purposes of establishing unexpected results or properties, the law requires that those studies analyze a direct comparison between the claimed invention and the closest prior art. At the same time, Plaintiffs may demonstrate unexpected results in reliance upon mediums other than comparative tests. Given that objective evidence "must be commensurate in scope with the claims which the evidence is offered to support," for purposes of this application, although this factor weighs in Plaintiffs favor, the Court does not

accord a great deal of weight to the unexpected properties associated with Tarka®, an embodiment significantly narrower than the claims which are the subject of the invention.  See  Asyst, 544 F.3d at 1315.

b.    Commercial Success

"Commercial success is 'usually shown by significant sales in a relevant market.'" Daiichi Sankyo Co. v. Mylan Pharms., 2009 U.S. Dist. LEXIS 67978, at *63-64 (D.N.J. July 30, 2009) (quoting Ecolochem, Inc. v. Southern Cal. Edison Co., 227 F.3d 1361, 1377 (Fed. Cir. 2000) ( "We have further held that a presumption arises that the patented invention is commercially successful 'when a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent.'")). "However, evidence showing sale of a large number of goods supposedly embodying the claimed invention does not necessarily demonstrate non-obviousness." Daiichi, 2009 U.S. Dist. LEXIS at *64.  "The success must be due to the claimed features of the invention, rather than factors such as advertising, superior workmanship, or other features within the commercialized technology." Id. Upon a showing of a nexus between commercial success and the patented invention, the burden shifts to the Defendant to demonstrate that commercial success is the product of "other factors extraneous to the patented invention." Ecolochem, 227 F.3d at 1377.

Plaintiffs contend that Tarka®'s net annual sales increased from $16.7 million in 2001 to $81 million in 2008.  Indeed, although Abbott's promotion of Tarka® discontinued as of 2006, Plaintiffs indicate that the net annual sales increased from $94.9 million in 2006 to $101.4 million in 2007.  In response, Defendants assert that the alleged sales are the product of marketing efforts by Abbott. Defendants argue that even if the drug is considered a commercial success, the alleged success cannot

27

be attributed to the '244 patent because Tarka® contains the ACE inhibitor trandolapril, not quinapril, patented by Abbott under U.S. Patent No. 4,933,361 (the "'361 patent). The '361 patent issued in 1990 and expired as of June 12, 2007. However, despite the expiration of the '361 patent in 2007, Plaintiffs contend that Tarka® has continued to gross over $114.7 million in sales that can only be attributable to the '244 patent.

For purposes of this application, the Court agrees with Plaintiffs that, at the very least, the net sales of Tarka® subsequent to the expiration of the '361 patent are indicative of commercial success.

### c.       Licensing

Commercial acquiescence of competitors is evidenced by extensive licensing. See RCA Corp. v. Applied Digital Data Systems, Inc., 730 F.2d 1440, 1448 (Fed. Cir. 1984). Plaintiffs contend that Abbott invested in Tarka® by paying Aventis Pharma S.A. $290 million to obtain the exclusive right to make and market Tarka® under the '244 patent. Plaintiffs also present the Court with purported offers to acquire a license of Tarka® in exchange for substantial price, however, none of these offers resulted in actual licenses. Therefore, licensing weighs in Plaintiffs favor minimally.

### d.       Copying

The Federal Circuit and the United States District Courts for the District of New Jersey routinely consider evidence of copying. See Ortho-McNeil Pharm, Inc. v. Mylan Labs., Inc., 520 F.3d 1358, 1365 (Fed. Cir. 2008); Daiichi, 2009 U.S. Dist. LEXIS 67978 (D.N.J. July 30, 2009). "The Hatch-Waxman Act strikes a balance between the sometimes-competing policy interests of inducing pioneering research and development of new drugs and enabling production of low-cost, generic copies of those drugs." Eli Lilly & Co. v. Teva Pharms. United States, Inc., 557 F.3d 1346, 1348 (Fed. Cir. 2009). With the advent of the Hatch-Waxman Act, the copying rationale in the context of an

ANDA application has been recognized as weak, but not irrelevant.  Pfizer Inc. v. Teva, 2006 U.S. Dist. LEXIS 77967, at *5 (D.N.J. Oct. 26, 2006).  In the foregoing case, the court recognized that "more than the mere fact of copying by an accused infringer is needed to make that action significant to a determination of the obviousness issue." Id. (quoting Cable Electric Prods. Inc v. Genmark, Inc., 770 F.2d 1015, 1028 (Fed. Cir. 1985)).  However, that Court acknowledged that "the fact that this case arises under the Hatch-Waxman Act does not render the evidence entirely irrelevant." Id.

Plaintiffs assert that Defendants' copycat version of Tarka® demonstrates non-obviousness. Defendants do not appear to respond to this accusation. Therefore, this factor weighs in favor of Plaintiffs.

Defendants' have raised a substantial question concerning the validity of the '244 patent that Plaintiffs have yet to overcome.  For purposes of this application exclusively, the balance of the statutory obviousness inquiry weighs in favor of Defendants and against the issuance of a preliminary injunction and temporary restraining order.

### B.      Irreparable Harm

Plaintiffs allege that the launch of Defendants' generic version of Tarka® will result in irreparable harm as a consequence of irreversible market loss, irreversible price erosion, lost business opportunities, loss of goodwill and an alleged inability of Defendants to compensate Plaintiffs for alleged prospective harm. By contrast, Defendants assert that Plaintiffs' alleged loss of market share, price erosion, lost business opportunities and loss of goodwill are too speculative to quantify. Further, Defendants contend that Plaintiffs' speculation as to an appropriate award of damages is overinflated, and in the event that Plaintiffs prevail, Defendants allege that with an appropriate measure of damages Plaintiffs will be adequately compensated.

29

"Plaintiffs must provide a 'clear showing' that it will suffer irreparable harm in the absence of injunctive relief." King Pharms, Inc. v. Sandoz, Inc., 2010 U.S. Dist. LEXIS 48385, *13 (D.N.J. May 17, 2010) (citing Nutrition 21 v. United States, 930 F.2d 867, 870-71 (Fed. Cir. 1991)). "Irreparable harm must be established as a separate element, independent of any showing of likelihood of success; irreparable harm can no longer be presumed." Id. (citing Winter v. Natural Resources Defense Counsel, Inc., 129 S. Ct. 365 (2008)).  "[C]ourts have routinely decided that market share and price erosion do not amount to irreparable harm." Id. at *14. (citing Nutrition 21, 930 F.2d at 871; Eli Lilly v. American Cyanamid Co., 82 F.3d 1568, 1578 (Fed. Cir. 1996)). "[N]either the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial." Id. (citing Nutrition, 930 F.2d at 871). Further, as previously stated by this Court, a "loss of market share and price erosion are economic harms and are compensable by money damages …. [even] in the context of generic competition in the pharmaceutical industry …." Novartis Pharms. Corp. v. Teva Pharms. Corp., 2007 U.S. Dist. LEXIS 65792, *14 (D.N.J. Sep. 6, 2007).

As a result of the threat of market entry of the generic version of Tarka®, Plaintiffs assert an irreparable loss of formal bids to purchase the Tarka® asset. Moreover, to the extent prospective purchasers have not withdrawn offers, the value of those offers has been dramatically reduced.  The value of each bid alleged by Plaintiffs presents a quantifiable measure for ascertaining economic damages. Indeed, in claiming irreparable harm on the basis of lost business opportunities, Plaintiffs quantify and present the Court with a range of prospective losses incurred by Abbott between $150 to $270 million dollars.

The remaining basis for irreparable harm, lost goodwill, is too speculative.  This trial is

scheduled to proceed in August, therefore, a final resolution on the merits is imminent.  For purposes of this application, Plaintiffs' alleged irreparable harm does not favor the imposition of a preliminary injunction and temporary restraints.

For purposes of this application exclusively, the inquiry concerning irreparable harm weighs in favor of Defendants.

### C.    Balance of Hardships

Defendants' product has yet to enter the marketplace.  Arguably, therefore, the prospective harm incurred by Defendants as a consequence of the issuance of the preliminary injunction is likely outweighed by the prospective harm incurred by Plaintiffs as a consequence of the non-issuance of a preliminary injunction.

For purposes of this application exclusively, the balance of hardships weighs in favor of Plaintiffs.

### D.    Public Interest

The Court recognizes the public interest in enforcing valid patents.  Everett Labs., Inc. v. Breckenridge Pharm., Inc., 573 F. Supp. 2d 855 (D.N.J. 2008).  However, where a substantial question has been raised, the public interest benefits from the denial of an injunction.  Abbott Labs. v. Andrx Pharms. Inc., 452 F.3d 1331, 1338 (Fed. Cir. 2006).

For purposes of this application exclusively, Defendants have raised a substantial question concerning validity, therefore, the public interest weighs in favor of Defendants.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' application for a preliminary injunction and

temporary restraining order is **denied**.  An appropriate Order accompanies this Opinion.


                                          S/  Dennis M. Cavanaugh
                                          Dennis M. Cavanaugh, U.S.D.J.

Dated:          June   7  ,   2010
Original:     Clerk
cc:           All Counsel of Record
                Hon. Mark Falk, U.S.M.J.
                File